IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| BOSTON SCIENTIFIC CORPORATION,<br><br>Plaintiff<br><br>vs.<br><br>MIKELLE MABEY et al.,<br><br>Defendants | **FINDINGS OF FACT<br>AND<br>CONCLUSIONS OF LAW**<br><br>Case No. 2:10-cv-467 CW<br><br>Judge Clark Waddoups |

## INTRODUCTION

Plaintiff Boston Scientific Corporation seeks to enforce a non-compete agreement (the "Non-Compete Agreement") against Mikelle Mabey ("Mabey"). Mabey signed the agreement on March 2, 2009. Boston Scientific argues that in exchange for signing the Non-Compete Agreement, Mabey was eligible to earn, and did earn, $1,000 of additional compensation in the second, third, and fourth quarters of 2009, which she otherwise would not have received. Consequently, she received consideration. Mabey contends, however, that she was assured a quarterly bonus. Had she refused to sign the Non-Compete Agreement, Mabey would not have received the first $1,000 of her quarterly bonus. Thus, Mabey contends this potential loss of money constituted a forfeiture, rather than consideration, and the contract is therefore unenforceable. Additionally, because Boston Scientific could revoke her quarterly bonus at any time, without cause, Mabey contends Boston Scientific's promise that she would receive the bonus was illusory. Finally, Mabey contends the agreement was an unconscionable contract of adhesion.

Plaintiff and the defendants in this matter[1] filed cross-motions for summary judgment. The court heard oral argument on August 3, 2010. At that hearing, the parties stipulated and affirmed on the record that the court should treat their motions, and evidence submitted in support,[2] as a final trial on the merits, such that the court should make findings of fact and conclusions of law. The court has considered the parties' motions for summary judgment, including the arguments and exhibits submitted in support thereof. Based on the foregoing, the court finds and concludes as follows:

**FINDINGS OF FACT**

1. Plaintiff Boston Scientific Corporation ("Boston Scientific") markets and sells spinal cord stimulation devices ("SCS devices"), which are technologically complex neuromodulation devices used therapeutically to treat patients suffering from chronic pain or other medical conditions. (Docket No. 43, Ex. 1 at 5; Docket No. 43, Ex. 2 at 39.)

2. Mabey started working as a Sales Associate for a subsidiary of Boston Scientific in 2006.[3] (Docket No. 43, Ex. 1 at 3.)

3. When she was hired, Boston Scientific did not ask or require Mabey to sign a non-compete or non-solicitation agreement. (Docket No. 46, App. 171, ¶ 4.)

4. In 2007, Boston Scientific eliminated the Sales Associate position. (Docket No. 46,

---

[1] The defendants in this matter are Mabey and Advance Neuromodulation Systems, Inc. d/b/a/ St. Jude Neuromodulation Divison. Initially, St. Jude Medical, Inc. also was a defendant, but it was dismissed based on a stipulated motion by the parties. *See* Order (Docket No. 56).

[2] During the hearing, the parties stipulated that the evidence submitted in support of their motions is the same evidence that they would have submitted had a bench trial been held.

[3] Although Mabey was employed by a subsidiary of Boston Scientific, for ease of reference, the court will refer to the subsidiary as Boston Scientific.

App. 135.)  The goal was to split the Sales Associate title into two new titles—Clinical Specialist and Account Manager.  (*Id.* at App. 123.)  Mabey became a Clinical Specialist at that time.

      5.     A patient receiving an SCS device goes through an initial trial period to determine if the device is effective for that patient.  As a Clinical Specialist, Mabey was present in the operating room to help with the trial procedure.  If the trial procedure was successful, Mabey then helped with implanting the device, meeting with the patient for ongoing programming of the device, and answering any questions the patient might have.  (Docket No. 43, Ex. 1 at 5–6.)

      6.     When Mabey became a Clinical Specialist in 2007, her base salary increased from $54,995.20 to $80,002.00  (*See* Docket No. 43, Ex. 2 at 30.)  Additionally, Boston Scientific had a variable compensation program whereby a Clinical Specialist could earn additional money based on the sales performance of the district he or she supported.  (Docket No. 43, Ex. 1 at 50–51, 64, 74.)

      7.     Boston Scientific typically changed the variable compensation program one or more times per year.  Each new plan document specified that it superseded all previous compensation plans.  (*See, e.g.*, Docket No. 43, Ex. 1 at 55, 62, 67, 73, 77, 83, 88; Docket No. 43, Ex. 2 at 3, 9, 15, 21.)  The plans also stated that Boston Scientific reserved the right to "amend, supplement, or eliminate" the program.  (Docket No. 43, Ex. 1 at 55, 67, 77, 88; Docket No. 43, Ex. 2 at 9, 21.)

      8.     In 2008, Boston Scientific issued two different compensation plans, one for the first and second quarters and another for the third and fourth quarters.  (Docket No. 43, Ex. 1 at 60–70, 72–80.)

      9.     Under both 2008 compensation programs, Clinical Specialists were "eligible to earn [a] Support Bonus based on the performance of the District that they support[ed]."  (Docket No. 43, Ex. 1 at 64, 74.)  The first 2008 compensation program specified the bonus was to be "paid in

quarterly increments at the end of each calendar quarter and annually will equal 15% of the Clinical Specialist Base Salary." (*Id.* at 64.) The second 2008 compensation program modified this provision to state the bonus "annually equals 15% of the Clinical Specialist Base Salary *or more*." (*Id.* at 74) (emphasis added). Moreover, it assured that "[a]lthough the Support Bonus is based on District performance, the minimum amount earned is no less than 80% of the total potential bonus amount." (*Id.* at 64, 74.) In February 2008, Mabey's base salary increased to $88,002.20. (Docket No. 43, Ex. 2 at 29.) Consequently, for quarters two, three, and four of 2008, her guaranteed Support Bonus was $2,640 per quarter.

10. Despite the 2008 compensation programs specifying Mabey was to receive "no less than 80% of the total potential bonus amount," this guarantee was subject to the Sales Operations Compliance Program ("Compliance Program"), which was initiated that year. (Docket No. 43, Ex. 1 at 62, 73.) The Compliance Program provided in relevant part:

> Each quarter, the first $1,000 in variable compensation will be earned only if the Territory Manager is compliant with all Sales Operations objectives for that quarter. This $1,000 will be known as the "Compliance Incentive." A Territory Manager who has one (1) Non-Compliance in a calendar quarter will forfeit the first $330 of the Compliance Incentive. A second non-compliance by a Territory Manager in the quarter will result in the forfeit of the entire Compliance Incentive for that quarter. As noted, this is in addition to any disciplinary action that might occur as a result of such non-compliance.

(Docket No. 43, Ex. 1 at 62.) Although the paragraph referred to the Territory Manager, the section also stated that it applied to all Clinical Specialists.[4] (*Id.*) Consequently, as a Clinical Specialist,

---

[4] Subsequently, the section was modified and substituted "Clinical Specialist" in place of "Territory Manager." (Docket No. 43, Ex. 1 at 73.)

Mabey could forfeit up to $1,000 of her Support Bonus payment per quarter if she failed to keep the Compliance Program standards.

11. In 2008, Mabey was compliant with all program objectives. (Docket No. 43, Ex. 2 at 48.) As a result, no amount was deducted from her quarterly Support Bonus. In total, Mabey earned $8,398 in variable compensation. (*Id.*)

12. In late 2008, Boston Scientific became concerned that it was at a competitive disadvantage because, unlike its competitors, Boston Scientific had not required its employees to sign a non-compete provision. (Docket No. 43, Ex. 2 at 26.) Consequently, Boston Scientific began discussing ways to implement such an agreement with its employees.

13. John Oakes is Boston Scientific's Vice-President of Human Resources and is also an attorney. (Docket No. 49, App. 214–215.) On January 6, 2009, he sent an e-mail stating that he wanted to tie the proposed Non-Compete Agreement to the Sale Representative's commission plan because "that is most likely to ensure the broadest participation by our sales people and doesn't require additional monies." (Docket No. 46, App. 89.)

14. The term "Sales Representative" encompassed several positions at Boston Scientific, including Mabey's position as a Clinical Specialists. (*See* Docket No. 43, Ex. 2 at 26.)

15. Oakes also sent an e-mail to Allen Meacham ("Meacham"), the Vice-President of Sales, on January 6, 2009. In that e-mail, Oakes explained that under the new proposal, it would be mandatory for new hires, those promoted to a director position, and those accepting an equity agreement to sign the Non-Compete Agreement. (Docket No. 46, App. 88.) He acknowledged that "getting a job, getting a promotion, or getting stock" constituted "independent consideration" for the Non-Compete Agreement. (*Id.*) For all other Sales Representatives, however, Oakes stated, "the

legal folks apparently have gotten hung up" over "what consideration to provide in exchange for signing the [Non-Compete Agreement]." (*Id.*) Oakes then stated the following:

> [I]nitially the plan was to tie eligibility for commissions plans to signing the agreement. For reasons that are unclear to me, they changed that to proposing that each sales organization pay each rep. $1,000 in exchange for signing - until I pointed out that that may not be enough to induce everyone to sign and that they didn't publicize this so that anyone could budget for it (in our case it's ~ a $300K hit that isn't in the budget).

(Docket No. 46, App. 88.) He asked Meacham if it was okay for him to go forward with the "plan to tie our sales people's signing of the [Non-Compete Agreement] to their acceptance of their commission plan." (*Id.*) Meacham approved the plan. (*Id.*)

16. On or about January 27, 2009, Ken Oreglia ("Oreglia"), Boston Scientific's Director of Sales Strategy and Operations, circulated a "frequently asked questions" ("FAQ) summary to Boston Scientific Sales Directors about the proposed non-compete plan. (Docket No. 46, App. 85.) In that summary, Oreglia stated that if a Sales Representative refused to sign the Non-Compete Agreement, "[t]hey will forfeit the first $2500 in variable compensation every quarter ($1000 for [Clinical Specialists])." (Docket No. 46, App. 86.)

17. Oreglia also sent the FAQ summary to Oakes. (Docket No. 46, App. 84.) Oakes stated the following: "I wouldn't say they 'forfeit' the commissions but rather are not considered to have earned and hence are not eligible to receive. Realize same result, but how you get there can matter legally." (*Id.* at App. 84.)

18. As a result of these discussions, Boston Scientific added the following condition to its compensation plan:

> Effective April 1, 2009, to be considered to have earned (and hence

-6-

>    to be entitled to payment of) the first $1,000 in variable compensation each quarter, a sales representative must have signed the current version of the Boston Scientific Agreement Concerning Employment for U.S. Employees on or before March 1, 2009. Sales Representatives who have signed the Agreement by that date are eligible for all commissions described in this Plan, subject to the other provisions of the Plan. Sales Representatives who have not signed the Agreement by that date are deemed not to have earned and thus are not eligible to receive the first $1,000 in variable compensation per quarter, nor will they be eligible for participation in any Neuromodulation Sales award programs.

(Docket No. 43, Ex. 1 at 85.)

19. No other substantive changes were made to Boston Scientific's compensation plan. Accordingly, for 2009, Mabey's base salary remained $88,002.20. (Docket No. 43, Ex. 2 at 28.) Likewise, the Compliance Program and calculation of her Support Bonus otherwise remained the same. (Docket No. 43, Ex. 2 at 3, 6.)

20. On February 26, 2009, Oreglia sent an e-mail to Mabey and other Boston Scientific employees explaining that Boston Scientific was implementing a non-compete agreement. (Docket No. 43, Ex. 2 at 26.) In that e-mail, Oreglia informed the existing employees that they were not required to sign the Non-Compete Agreement as a condition of continued employment. (*Id.*)

21. Mabey signed the Non-Compete Agreement on March 2, 2009. (Docket No. 43, Ex. 1 at 30–34.)

22. "[D]ue to the high sales performance of her Territory," Mabey qualified for and received a Support Bonus of $14,294 in 2009. (Docket No. 43, Ex. 2 at 49, ¶ 27.) Because she signed the Non-Compete Agreement, she received $1,000 for quarters two, three, and four of that year, for a total of $3,000. Had she not signed the Non-Compete Agreement, she would have only received a Support Bonus of $11,294. (*Id.* at 50, ¶ 29.)

23. Among other provisions, the Non-Compete Agreement specifies:

> While employed by Boston Scientific and during the Restricted Period, the Employee shall not, in any capacity, directly or indirectly, personally or through another person, (i) solicit the business or patronage of any Customer of Boston Scientific for or on behalf of a business that competes with Boston Scientific, (ii) divert, entice, or otherwise take away from Boston Scientific the business or patronage of any Customer of Boston Scientific, or attempt to do so, or (iii) solicit or induce any vendor, supplier or Customer of Boston Scientific to terminate or reduce its relationship with Boston Scientific.

(Docket No. 43, Ex. 1 at 32.)

24. For Mabey, the "Restricted Period" is one year. (Docket No. 1, ¶ 29; Docket No. 43, Ex. 1 at 32.)

25. On May 3, 2010, Mabey provided Boston Scientific with written and oral notice that she was resigning from Boston Scientific and going to work for St. Jude's neuromodulation division. (Docket No. 43, Ex. 1 at 8.) St. Jude is a competitor of Boston Scientific.

## CONCLUSIONS OF LAW

1. The Non-Compete Agreement states that it "shall be interpreted and enforced as a Massachusetts contract and shall be interpreted and enforced in accordance with the internal laws of the Commonwealth of Massachusetts." (Docket No. 43, Ex. 1 at 34.) The parties agree that Massachusetts law applies.

2. In Massachusetts, non-competition agreements are strictly construed against the employer. *Rellstab v. John Hancock Fin. Servs., Inc.*, No. 01-1281, 2004 Mass. Super. LEXIS 133, at *3 (Mass. Super. Mar. 17, 2004.)

3. For Boston Scientific to enforce a Non-Compete Agreement against Mabey, it must establish the non-compete: "(1) is necessary to protect the legitimate business interests of the

employer; (2) is supported by consideration; (3) is reasonably limited in all circumstances, including time and space; and (4) is otherwise consonant with public policy." *Mazonson, Inc. v. Greenbaum*, No. 07-1327, 2007 Mass. Super. LEXIS 172, at *2 (Mass. Super. May 4, 2007) (citing *IKON Office Solutions, Inc. v. Belanger*, 59 F. Supp. 2d 125, 128 (D. Mass. 1999)).

4.  In this case, the second element regarding "consideration" is disputed by the parties. Under Massachusetts law, "[a]ny time a restrictive covenant is signed by an employee, the employer must provide some *clear additional benefit*." *Cypress Group, Inc. v. Stride & Assocs., Inc.*, No. 03-6070, 2004 Mass. Super. LEXIS 69, at *8–9 (Mass. Super. Feb. 11, 2004) (citation omitted) (emphasis added); *see also IKON Office Solutions, Inc.*, 59 F. Supp. 2d at 131.

5.  Massachusetts cases pertaining to continued employment are instructive here because they address how Massachusetts courts apply the "clear additional benefit" requirement. Even in an at-will employment situation, some Massachusetts courts have specified that merely offering continued employment in exchange for the employee signing a Non-Compete Agreement does not constitute a "clear additional benefit." *See Eng'g Mgmt. Support, Inc. v. Puca*, No. MICV2005-01082, 2005 Mass. Super. LEXIS 242, at *3 (Mass. Super. Apr. 8, 2005) (denying a preliminary injunction seeking enforcement of non-competition agreement because the only consideration given was continued employment); *Rellstab*, 2004 Mass. Super. LEXIS 133, at *3 (noting that mere continued employment is not consideration for a non-compete agreement).

6.  In *IKON Office Solutions, Inc.*, the defendant was a salesman for M.B.S. Business Systems, Inc. ("MBS"). IKON then acquired MBS. Approximately nine months after IKON acquired MBS, IKON had the defendant sign two covenants not to compete. *IKON Office Solutions, Inc.*, 59 F. Supp. 2d at 127. When the defendant left IKON and became associated with a new

company, IKON sought to enforce the restrictive covenants by preliminary injunction. *Id.* at 126. IKON argued that the defendant's continued employment was sufficient consideration to uphold the restrictive covenant. *Id.* at 130. The court said, however, that "in order for a restrictive covenant to withstand scrutiny, some additional consideration ought pass to an employee upon the execution of a post-employment agreement." *Id.* at 131. Because the court found the agreements were not supported by consideration, the court denied IKON's motion. *See id.*

7. Although Boston Scientific had the authority to change Mabey's compensation from year-to-year, merely continuing compensation at the same level, in exchange for the Non-Compete Agreement, no more constituted a "clear additional benefit" than continuing a person's employment does in an at-will employment situation.

8. Boston Scientific knew that it had to provide consideration in exchange for the Non-Compete Agreement.

9. With the exception of the non-compete provision, Boston Scientific's 2008 compensation programs were substantively identical to its 2009 compensation program. Mabey received no raise, promotion, stock offer, or other similar increase to her compensation. How her Support Bonus was calculated also remained the same. The compensation programs in 2008 and 2009 both guaranteed that Mabey would receive a Support Bonus of "no less than 80% of the total potential bonus amount," which bonus potential was 15% of her annual base salary. Thus, Boston Scientific structured the Non-Compete Agreement in such a way that it would experience no financial cost for it.

10. Despite the guarantee of a minimum Support Bonus, in 2008, Boston Scientific instituted the Compliance Program. If Mabey had not met the Compliance Program standards in

2008 or 2009, her Support Bonus would have decreased from $2,640 per quarter to $1,640 per quarter. Such deductions for performance blots constituted a forfeiture.

11. The inclusion of the non-compete provision in 2009 added yet another condition onto Mabey receiving the guaranteed Support Bonus. According to the unmodified Support Bonus formula, Mabey qualified for a $14,294 bonus in 2009. Yet, if Mabey had refused to sign the Non-Compete Agreement, Boston Scientific would have lowered her Support Bonus to $11,294. Stated differently, if Mabey signed the non-compete agreement, calculation of her compensation would remain the same. If she did not sign the non-compete agreement, calculation of her compensation would be modified to include a $3,000 reduction in pay. Construing the non-compete provision strictly against Boston Scientific, the court concludes the $3,000 reduction would have constituted a forfeiture because it would have been deducted from her guaranteed Support Bonus amount.

12. Massachusetts law requires an employer to provide a clear *additional* benefit in exchange for an employee signing a non-compete provision. Because Boston Scientific merely kept Mabey's compensation plan the same, the court holds that Mabey received no clear additional benefit in exchange for her signing the Non-Compete Agreement. Accordingly, the Non-Compete Agreement is unenforceable due to lack of consideration.

13. Because this conclusion is dispositive, the court does not reach whether Boston Scientific's promise of a Support Bonus was illusory. Nor does the court reach whether the agreement was an unconscionable contract of adhesion.

**ORDER**

Based on the foregoing, the court declares that the Non-Compete Agreement is unenforceable, due to lack of consideration, and that Mabey is not bound by its terms. Each party

shall bear its own costs.

DATED this 15th day of September, 2010.

BY THE COURT:

_____
Clark Waddoups
United States District Judge